**COLUMBIA NITROGEN CORPORATION, Appellant,**

v.

**ROYSTER COMPANY, Appellee.**

**No. 15080.**

United States Court of Appeals, Fourth Circuit.

Argued April 6, 1971.

Decided Oct. 26, 1971.

4

**6**

---

Cornelius B. Thurmond, Jr., Augusta, Ga., and John C. Scott, Washington, D. C. (Thurmond & McElmurray, Augusta, Ga., David A. Donohoe, New York City, and Rowley & Scott, Washington, D. C., Robert R. MacMillan and Breeden, Howard & MacMillan, Norfolk, Va., on the brief), for appellant.

Richard B. Spindle, III, Norfolk, Va., and Milton Handler, New York City (John M. Hollis, Hugh L. Patterson, Thomas G. Johnson, Jr., Willcox, Savage, Lawrence, Dickson & Spindle, Norfolk, Va., Michael D. Blechman, Kaye, Scholer, Fierman, Hays & Handler, New York City, on the brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WINTER and BUTZNER, Circuit Judges.

BUTZNER, Circuit Judge:

Columbia Nitrogen Corp. appeals a judgment in the amount of $750,000 in favor of F. S. Royster Guano Co. for breach of a contract for the sale of phosphate to Columbia by Royster. Columbia defended on the grounds that the contract, construed in light of the usage of the trade and course of dealing, imposed no duty to accept at the quoted prices the minimum quantities stated in the contract. It also asserted an antitrust defense and counterclaim based on Royster's alleged reciprocal trade practices.[1] The district court excluded the evidence about course of dealing and usage of the trade. It submitted the antitrust issues based on coercive reciprocity to the jury, but refused to submit the alternative theory of non-coercive reciprocity. The jury found for Royster on both the contract claim and the antitrust counterclaim. We hold that Columbia's proffered evidence was improperly excluded and Columbia is entitled to a new trial on the contractual issues. With respect to the antitrust issues, we affirm.

I.

Royster manufactures and markets mixed fertilizers, the principal components of which are nitrogen, phosphate and potash. Columbia is primarily a producer of nitrogen, although it manufactures some mixed fertilizer. For several years Royster had been a major purchaser of Columbia's products, but Columbia had never been a significant customer of Royster. In the fall of 1966, Royster constructed a facility which enabled it to produce more phosphate than it needed in its own operations. After extensive negotiations, the companies executed a contract for Royster's sale of a minimum of 31,000 tons of phosphate each year for three years to Columbia, with an option to extend the term. The contract stated the price per ton, subject to an escalation clause dependent on production costs.[2]

---

1. Royster alleged diversity jurisdiction. 28 U.S.C. § 1332 (1964). Columbia's defense and counterclaim were based on 15 U.S.C. §§ 1 and 15 (1964).

2. In pertinent part, the contract provides: "Contract made as of this 8th day of May between COLUMBIA NITRO- GEN CORPORATION, a Delaware corporation, (hereinafter called the Buyer) hereby agrees to purchase and accept from F. S. ROYSTER GUANO COMPANY, a Virginia corporation, (hereinafter called the Seller) agrees to furnish quantities of Diammonium

Phosphate prices soon plunged precipitously. Unable to resell the phosphate at a competitive price, Columbia ordered only part of the scheduled tonnage. At Columbia's request, Royster lowered its price for diammonium phosphate on shipments for three months in 1967, but specified that subsequent shipments would be at the original contract price. Even with this concession, Royster's price was still substantially above the market. As a result, Columbia ordered less than a tenth of the phosphate Royster was to ship in the first contract year. When pressed by Royster, Columbia offered to take the phosphate at the current market price and resell it without brokerage fee. Royster, however, insisted on the contract price. When Columbia refused delivery, Royster sold the unaccepted phosphate for Columbia's account at a price substantially below the contract price.

## II.

Columbia assigns error to the pretrial ruling of the district court excluding all evidence on usage of the trade and course of dealing between the parties. It offered the testimony of witnesses with long experience in the trade that because of uncertain crop and weather conditions, farming practices, and government agricultural programs, express price and quantity terms in contracts for materials in the mixed fertilizer industry are mere projections to be adjusted according to market forces.[3]

Phosphate 18–46–0, Granular Triple Superphosphate 0–46–0, and Run-of-Pile Triple Superphosphate 0–46–0 on the following terms and conditions.

"*Period Covered by Contract*—This contract to begin July 1, 1967, and continue through June 30, 1970, with renewal privileges for an additional three year period based upon notification by Buyer and acceptance by Seller on or before June 30, 1969. Failure of notification by either party on or before June 30, 1969, constitutes an automatic renewal for an additional one-year period beyond June 30, 1970, and on a year-to-year basis thereafter unless notification of cancellation is given by either party 90 days prior to June 30 of each year.

"*Products Supplied Under Contract*

| | Minimum Tonnage Per Year |
|---|---|
| "Diammonium Phosphate 18–46–0 | 15,000 |
| Granular Triple Superphosphate 0–46–0 | 15,000 |
| Run-of-Pile Triple Superphosphate 0–46–0 | 1,000 |

"Seller agrees to provide additional quantities beyond the minimum specified tonnage for products listed above provided Seller has the capacity and ability to provide such additional quantities.

\* \* \* \* \*

"*Price*—In Bulk F.O.B. Cars, Royster, Florida.

| | |
|---|---|
| Diammonium Phosphate 18–46–0 | $61.25 Per Ton |
| Granular Triple Superphosphate 0–46–0 | $40.90 Per Ton |
| Run-of-Pile Triple Superphosphate 0–46–0 | $0.86 Per Unit |

\* \* \* \* \*

"*Default*—If Buyer fails to pay for any delivery under this contract within 30 days after Seller's invoice to Buyer and then if such invoice is not paid within an additional 30 days after the Seller notifies the Buyer of such default, then after that time the Seller may at his option defer further deliveries hereunder or take such action as in their judgment they may decide including cancellation of this contract. Any balances carried beyond 30 days will carry a service fee of ¾ of 1% per month.

\* \* \* \* \*

"*Escalation*—The escalation factor up or down shall be based upon the effects of changing raw material cost of sulphur, rock phosphate, and labor as follows. These escalations up or down to become effective against shipments of products covered by this contract 30 days after notification by Seller to Buyer.

"No verbal understanding will be recognized by either party hereto; this contract expresses all the terms and conditions of the agreement, shall be signed in duplicate and shall not become operative until approved in writing by the Seller."

3. Typical of the proffered testimony are the following excerpts:

¶ "The contracts generally entered into between buyer and seller of materials has always been, in my opinion, construed to be the buyer's best estimate of his anticipated requirements for a given period of time. It is well known

Columbia also offered proof of its business dealings with Royster over the six-year period preceding the phosphate contract. Since Columbia had not been a significant purchaser of Royster's products, these dealings were almost exclusively nitrogen sales to Royster or exchanges of stock carried in inventory. The pattern which emerges, Columbia claimed, is one of repeated and substantial deviation from the stated amount or price, including four instances where Royster took none of the goods for which it had contracted. Columbia offered proof that the total variance amounted to more than $500,000 in reduced sales. This experience, a Columbia officer offered to testify, formed the basis of an understanding on which he depended in conducting negotiations with Royster.

The district court held that the evidence should be excluded. It ruled that "custom and usage or course of dealing are not admissible to contradict the express, plain, unambiguous language of a valid written contract, which by virtue of its detail negates the proposition that the contract is open to variances in its terms. * * *"

■ A number of Virginia cases have held that extrinsic evidence may not be received to explain or supplement a written contract unless the court finds the writing is ambiguous. *E. g.,* Mathieson Alkali Works v. Virginia Banner Coal Corp., 147 Va. 125, 136 S.E. 673 (1927). This rule, however, has been changed by the Uniform Commercial Code which Virginia has adopted. The Code expressly states that it "shall be liberally construed and applied to promote its underlying purposes and policies," which include "the continued expansion of commercial practices through custom, usage and agreement of the parties * * *." Va.Code Ann. § 8.1–102 (1965). The importance of usage of trade and course of dealing between the parties is shown by § 8.2–202,[4] which

in our industry that weather conditions, farming practices, government farm control programs, change requirements from time to time. And therefore allowances were always made to meet these circumstances as they arose."

¶ "Tonnage requirements fluctuate greatly, and that is one reason that the contracts are not considered as binding as most contracts are, because the buyer normally would buy on historical basis, but his normal average use would be per annum of any given material. Now that can be affected very decidedly by adverse weather conditions such as a drought, or a flood, or maybe governmental programs which we have been faced with for many, many years, seed grain programs. They pay the farmer not to plant. If he doesn't plant, he doesn't use the fertilizer. When the contracts are made, we do not know of all these contingencies and what they are going to be. So the contract is made for what is considered a fair estimate of his requirements. And, the contract is considered binding to the extent, on him morally, that if he uses the tonnage that he will execute the contract in good faith as the buyer. * * *"

¶ "I have never heard of a contract of this type being enforced legally. * *

Well, it undoubtedly sounds ridiculous to people from other industries, but there is a very definite, several very definite reasons why the fertilizer business is always operated under what we call gentlemen's agreements. * * *"

¶ "The custom in the fertilizer industry is that the seller either meets the competitive situation or releases the buyer from it upon proof that he can buy it at that price. * * * [T]hey will either have the option of meeting it or releasing him from taking additional tonnage or holding him to that price. * * *"

¶ And this custom exists "regardless of the contractual provisions."

¶ "[T]he custom was that [these contracts] were not worth the cost of the paper they were printed on."

4. Va.Code Ann. § 8.2–202 provides:
"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
(a) by course of dealing or usage of

authorizes their use to explain or supplement a contract. The official comment states this section rejects the old rule that evidence of course of dealing or usage of trade can be introduced only when the contract is ambiguous.[5] And the Virginia commentators, noting that "[t]his section reflects a more liberal approach to the introduction of parol evidence * * * than has been followed in Virginia," express the opinion that *Mathieson, supra,* and similar Virginia cases no longer should be followed. Va. Code Ann. § 8.2–202, Va. Comment. *See also* Portsmouth Gas Co. v. Shebar, 209 Va. 250, 253 n.1, 163 S.E.2d 205, 208 n.1 (1968) (dictum). We hold, therefore, that a finding of ambiguity is not necessary for the admission of extrinsic evidence about the usage of the trade and the parties' course of dealing.

We turn next to Royster's claim that Columbia's evidence was properly excluded because it was inconsistent with the express terms of their agreement. There can be no doubt that the Uniform Commercial Code restates the well established rule that evidence of usage of trade and course of dealing should be excluded whenever it cannot be reasonably construed as consistent with the terms of the contract. Division of Triple T Service, Inc. v. Mobil Oil Corp., 60 Misc. 2d 720, 304 N.Y.S.2d 191, 203 (1969), *aff'd mem.,* 311 N.Y.S.2d 961 (1970). Royster argues that the evidence should be excluded as inconsistent because the contract contains detailed provisions regarding the base

price, escalation, minimum tonnage, and delivery schedules. The argument is based on the premise that because a contract appears on its face to be complete, evidence of course of dealing and usage of trade should be excluded. We believe, however, that neither the language nor the policy of the Code supports such a broad exclusionary rule. Section 8.2–202 expressly allows evidence of course of dealing or usage of trade to explain or supplement terms intended by the parties as a final expression of their agreement.[6] When this section is read in light of Va. Code Ann. § 8.1–205(4),[7] it is clear that the test of admissibility is not whether the contract appears on its face to be complete in every detail, but whether the proffered evidence of course of dealing and trade usage reasonably can be construed as consistent with the express terms of the agreement.

The proffered testimony sought to establish that because of changing weather conditions, farming practices, and government agricultural programs, dealers adjusted prices, quantities, and delivery schedules to reflect declining market conditions. For the following reasons it is reasonable to construe this evidence as consistent with the express terms of the contract:

The contract does not expressly state that course of dealing and usage of trade cannot be used to explain or supplement the written contract.

The contract is silent about adjusting prices and quantities to reflect a declining market. It neither permits nor pro-

---

trade (§ 8.1–205) or by course of performance (§ 8.2–208) ; and
(b) by evidence of consistent additional terms unless the court find the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

5. Va.Code Ann. § 8.2–202, Comment 1 states:
"This section definitely rejects:
* * * * *
"(c) The requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the

court that the language used is ambiguous."

6. This section is set forth in full at note 4, *supra.*

7. Va.Code Ann. § 8.1–205(4) states:
"The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other ; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."

hibits adjustment, and this neutrality provides a fitting occasion for recourse to usage of trade and prior dealing to supplement the contract and explain its terms.

Minimum tonnages and additional quantities are expressed in terms of "Products Supplied Under Contract." Significantly, they are not expressed as just "Products" or as "Products Purchased Under Contract." The description used by the parties is consistent with the proffered testimony.

Finally, the default clause of the contract refers only to the failure of the buyer to pay for delivered phosphate.[8] During the contract negotiations, Columbia rejected a Royster proposal for liquidated damages of $10 for each ton Columbia declined to accept. On the other hand, Royster rejected a Columbia proposal for a clause that tied the price to the market by obligating Royster to conform its price to offers Columbia received from other phosphate producers. The parties, having rejected both proposals, failed to state any consequences of Columbia's refusal to take delivery— the kind of default Royster alleges in this case. Royster insists that we span this hiatus by applying the general law of contracts permitting recovery of damages upon the buyer's refusal to take delivery according to the written provisions of the contract. This solution is not what the Uniform Commercial Code prescribes. Before allowing damages, a court must first determine whether the buyer has in fact defaulted. It must do this by supplementing and explaining the agreement with evidence of trade usage and course of dealing that is consistent with the contract's express terms. Va.Code Ann. §§ 8.1–205(4), 8.-2–202. Faithful adherence to this mandate reflects the reality of the marketplace and avoids the overly legalistic interpretations which the Code seeks to abolish.

Royster also contends that Columbia's proffered testimony was properly rejected because it dealt with mutual willingness of buyer and seller to adjust contract terms to the market. Columbia, Royster protests, seeks unilateral adjustment. This argument misses the point. What Columbia seeks to show is a practice of mutual adjustments so prevalent in the industry and in prior dealings between the parties that it formed a part of the agreement governing this transaction. It is not insisting on a unilateral right to modify the contract.

Nor can we accept Royster's contention that the testimony should be excluded under the contract clause:

"No verbal understanding will be recognized by either party hereto; this contract expresses all the terms and conditions of the agreement, shall be signed in duplicate, and shall not become operative until approved in writing by the Seller."

Course of dealing and trade usage are not synonymous with verbal understandings, terms and conditions. Section 8.-2–202 draws a distinction between supplementing a written contract by consistent additional terms and supplementing it by course of dealing or usage of trade.[9] Evidence of additional terms must be excluded when "the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." Significantly, no similar limitation is placed on the introduction of evidence of course of dealing or usage of trade. Indeed the official comment notes that course of dealing and usage of trade, unless carefully negated, are admissible to supplement the terms of any writing, and that contracts are to be read on the assumption that these elements were taken for granted when the document was

---

8. The default clause is set forth at note 2, *supra.*

9. This section is set forth in full at note 4, *supra.*

phrased.[10] Since the Code assigns course of dealing and trade usage unique and important roles, they should not be conclusively rejected by reading them into stereotyped language that makes no specific reference to them. *Cf.* Provident Tradesmens Bank & Trust Co. v. Pemberton, 196 Pa.Super. 180, 173 A.2d 780 (1961). Indeed, the Code's official commentators urge that overly simplistic and overly legalistic interpretation of a contract should be shunned.[11]

We conclude, therefore, that Columbia's evidence about course of dealing and usage of trade should have been admitted. Its exclusion requires that the judgment against Columbia must be set aside and the case retried.

### III.

■ We find no error in the district court's refusal to enter judgment for Columbia on the basis of a purchase order Columbia issued and Royster acknowledged ten days after the contract was signed. On its face, the order included shipping and invoicing instructions, and the printed statement: "Seller's acknowledgment required, see reverse side for terms and conditions which are a part of this order and have the same force and effect as if set out on its face." On the reverse of the form were the following printed provisions:

"8. Purchaser reserves the right at any time to change this order in any particular with respect to goods not theretofore shipped thereunder. If any such change shall increase Seller's cost of performance, Seller shall immediately notify Purchaser thereof and an equitable adjustment in the price shall be made by written amendment to this order."

\* \* \* \* \* \*

"10. In case of conflict of any of the Purchaser's terms with those of Seller, Purchaser's terms will govern unless specific exception is agreed to in writing by Purchaser."

Royster acknowledged the receipt of the purchase order in writing.

Both parties agree that the contract and the purchase order must be read together. Relying on Va.Code Ann. § 8.-2–207, Columbia argues that the purchase order amended the contract because Royster's signed acknowledgment was an express agreement to the additional terms printed on the back.

The flaw in Columbia's argument is that § 8.2–207 applies only to the formation of contracts. It states, with certain exceptions not in issue here, that "[a] definite and seasonable expression of acceptance \* \* \* operates as an acceptance even though it states terms ad-

10. Va.Code Ann. § 8.2–202, Comment 2 states:

"Paragraph (a) [of § 8.202] makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used. Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean."

*See also* Levie, Trade Usage and Custom under the Common Law and the Uniform Commercial Code, 40 N.Y.U.L.Rev. 1101, 1111 (1965).

11. Referring to the general provisions about course of dealing and trade usage, Va. Code Ann. § 8.1–205, Comment 1 states:

"This Act rejects both the 'lay dictionary' and the 'conveyancer's' reading of a commercial agreement. Instead the meaning of the agreement of the parties is to be determined by the language used by them and by their action, read and interpreted in the light of commercial practices and other surrounding circumstances. The measure and background for interpretation are set by the commercial context, which may explain and supplement even the language of a formal or final writing."

ditional to or different from those of-fered or agreed upon * * *." Here the bargain became effective upon the execution of the contract several days before Columbia issued the purchase order. Indeed, the order itself acknowledges the contract for it expressly states that it was issued "to cover concentrated phosphate per contract dated May 8, 1967." [12]

As an alternative theory for summary judgment, Columbia argues that the purchase order was a modification of the contract under § 8.2–209. Noting that under this section "[a]n agreement modifying a contract within this title needs no consideration to be binding," Columbia claimed that Royster's acknowledgment of the purchase order effected a modification reflecting the additional terms printed on the reverse side.

The purchase order, however, does not purport to modify the terms of the contract. Columbia reserved the right to change only the order. The district judge held that this reservation referred to the order's shipping and invoicing instructions and not to the terms and conditions of the contract. The reference to the equitable adjustment in price in the second sentence of the reservation supports his interpretation. His ruling, we believe, is unimpeachable.

For the same reason there was no occasion to admit the purchase order in evidence. There is no dispute about shipping or invoicing, and the order, therefore, was not pertinent to the issues before the jury. Furthermore, it cannot be said that the purchase order corroborates the usage of trade or course of dealing on which Columbia relies. Neither trade usage nor prior dealing sanction unilateral modification of the contract regardless of market con-

ditions. Accompanied by proper instructions describing its role in the transaction, the order could have been admitted into evidence along with the contract. It has, however, no direct bearing on the controversy, and we find no abuse of discretion in its exclusion.

## IV.

Contrary to Columbia's contention, we find no reversible error in the district judge's charge to the jury on damages. However, the charge should be amplified on retrial.

Royster sold all the phosphate Columbia had rejected to the Mobil Oil Company for a sum considerably below the contract price. To recover the difference between the contract price and the resale price, Royster's sale to Mobil must have been "made in good faith and in a commercially reasonable manner." Va.Code Ann. § 8.2–706(1). Borrowing from the official comment, the court instructed the jury that "what is a commercially reasonable manner depends on the nature of the goods, the condition of the market and other circumstances in the case, and cannot be measured by any legal yardstick or divided into degrees. In determining whether the sale of the goods was done * * * in a commercially reasonable manner, you must inquire into all aspects of the sale and not just its manner." This is an accurate statement as far as it goes, but the comment further states that the statute is drawn to enable the seller "to resell in accordance with reasonable commercial practices so as to realize as high a price as possible in the circumstances," and "to dispose of the goods to the best advantage." Va. Code Ann. § 8.2–706, Comments 4 and 6.

The record discloses conflicting testimony about the market price, problems

---

12. On this basis, cases under § 2–207 of the Uniform Commercial Code cited by Columbia are distinguishable; *e. g.* Southeastern Enameling Corp. v. General Bronze Corp., 434 F.2d 330 (5th Cir. 1970), where the additional terms were included in a written confirmation, and Roto-Lith, Ltd. v. F. P. Bartlett & Co., Inc., 297 F.2d 497 (1st Cir. 1962), where the additional terms were printed on the acknowledgment form denoting acceptance.

of storage, and difficulties in making a sale of a large quantity of phosphate. In view of this evidence, it is important for the jury to be fully informed about a seller's obligation to dispose of the goods in a commercially reasonable manner. On retrial, therefore, the instruction explaining this section of the code should mention Royster's duty to realize as high a price as possible under all the circumstances. We find no merit in the other assignments of error to the court's charge on damages.

## V.

As an affirmative defense to Royster's action on the contract and as the basis for a counterclaim, Columbia pleaded that Royster had violated § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1964),[13] by engaging in reciprocal dealing.[14] Columbia introduced proof, denied by Royster, that Royster had exerted economic leverage through its purchases of nitrogen from Columbia to coerce Columbia to sign the phosphate contract. The court submitted the issue of coercive reciprocity to the jury, which found against Columbia on both its defense and counterclaim.[15]

Relying on the oft noted analogy to tying arrangements,[16] the district court instructed the jury to the effect that Columbia had to prove, among other facts, that a "not insubstantial" amount of interstate commerce was affected. *See* Northern Pacific Ry. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 2 L. Ed.2d 545 (1958). Columbia, citing

Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), now protests that proof of a "not insubstantial" amount of interstate commerce is an essential element only of a per se violation of the Sherman Act. It complains that this portion of the charge erroneously restricted the antitrust issues to a per se violation and foreclosed the claim sanctioned by *Fortner* "that the general standards of the Sherman Act have been violated." 394 U.S. at 500, 89 S.Ct. at 1257.

 Columbia, however, did not comply with Rule 51 of the Federal Rules of Civil Procedure by stating distinctly that it objected to the "not insubstantial" test. Instead it countered by requesting an instruction that it met the test on the basis of International Salt Co. v. United States, 332 U.S. 392, 68 S. Ct. 12, 92 L.Ed. 20 (1947), if the jury found the amount of affected business exceeded $500,000. The court first refused this request, but later it gave a supplemental charge to this effect. Having willingly embraced the advantages of going to the jury on a per se theory, Columbia cannot now shift to a theory based on the general standards of the Sherman Act. Moreover, since the jury's verdict discloses that it recognized that more than $500,000 of trade was affected, Columbia could not have been prejudiced by the charge. We also find no reversible error in the timing of the supplemental charge or in the court's modification of the language of Columbia's request. *See* Wiles v. Nationwide

---

13. 15 U.S.C. § 1 provides in part:
 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * *."

14. "The phrase 'reciprocal dealing' refers to the use of buying power to secure an advantage in the sale of one's products. While reciprocal dealing arrangements may take varied forms, the central core is the use of purchasing power to promote sales." ABA Antitrust Developments 1955–1968 at 11 (1968).

15. Since Royster prevailed, the propriety of the submission of the claim of coercive reciprocity to the jury is not directly in issue on appeal.

16. *See, e. g.,* United States v. General Dynamics Corp., 258 F.Supp. 36, 65 (S.D. N.Y.1966) ; Handler, Emerging Antitrust Issues: Reciprocity, Diversity and Joint Ventures, 49 Va.L.Rev. 433, 437 (1963) ; Hausman, Reciprocal Dealing and the Antitrust Laws, 77 Harv.L.Rev. 873, 883 (1964).

Life Insurance Co., 334 F.2d 296, 300 (4th Cir. 1964).

## VI.

Columbia now emphasizes an alternative antitrust theory. It contends that non-coercive reciprocity affords both a valid affirmative defense to Royster's action on the phosphate contract and a basis for recovery of treble damages on its counterclaim. The district court declined to submit these issues to the jury.

Coercive reciprocity has long been recognized as an anti-competitive practice that violates the antitrust laws.[17] Recent dictum of the Supreme Court, however, citing a description of the anticompetitive harm flowing from voluntary reciprocal dealing, evenhandedly condemned reciprocal trading that ensued either from coercion or "from more subtle arrangements." FTC v. Consolidated Foods Corp., 380 U.S. 592, 594 & n. 2, 85 S.Ct. 1220 (1965). Influenced in part by this opinion, one court has stated that non-coercive contracts for reciprocal dealing may violate § 1 of the Sherman Act. In reaching this conclusion, it reasoned that the antitrust laws are not designed merely to protect the individual merchant from coercion and other predatory practices. "The legislation," said the court, "is intended to preserve free competition. Reciprocity, whether mutual or coercive, serves to exclude competitors by the exercise of large scale purchasing power." United

States v. General Dynamics Corp., 258 F.Supp. 36, 66 (S.D.N.Y.1966).

In view of our disposition of this aspect of the case, we may assume, without deciding, that the reciprocal dealing disclosed by this record violated § 1 of the Sherman Act.[18] It does not follow, however, that Columbia is entitled to assert non-coercive reciprocity as an affirmative defense or as the basis for recovering treble damages on its counterclaim.[19]

■ Even in diversity actions, the effect of an act made illegal by a federal statute is to be decided by federal, not state, law. Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 176, 63 S.Ct. 172, 87 L.Ed. 165 (1942). Assuming as we have that the reciprocal dealing violated § 1 of the Sherman Act, Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), precludes one of the participants from interposing the violation as an affirmative defense to an action on the contract. In *Kelly,* the buyer of 50 carloads of onions, withdrew from storage only 13 cars, and the seller was forced to sell the remaining 37 on a declining market for the buyer's account. The seller then brought an action for the unpaid balance of the purchase price of the 13 cars and damages for the 37 cars. The buyer pleaded as an affirmative defense that the sale was part of an indivisible agreement, to which both the buyer and the seller were parties, that violated § 1 of the Sherman

---

17. FTC v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); California Packing Corp., 25 F.T.C. 379 (1937); Mechanical Mfg. Co., 16 F.T.C. 67 (1932); Waugh Equip. Co., 15 F.T.C. 232 (1931). Recently, the Government has obtained a series of consent decrees based on §§ 1 and 2 of the Sherman Act barring reciprocal dealing. *E. g.,* United States v. Bethlehem Steel Corp., 1970 Trade Cas. ¶ 73,376 (E.D. Pa., Dec. 11, 1970); United States v. General Tire & Rubber Co., 1970 Trade Cas. ¶ 73,303 (N.D.Ohio, Oct. 21, 1970). *See also* ABA Antitrust Developments 1955–1968 at 11–14, 87–89 (1968, Supp. 1971).

18. Viewing, as we must, the evidence on this issue in the light most favorable to

Columbia, the record discloses a long term written contract for Columbia's purchase from Royster of approximately $4,750,000 worth of phosphate conditioned on anticipated purchases of approximately $4,000,000 worth of nitrates by Royster from Columbia. This agreement was reached voluntarily by both parties who enjoyed sufficient economic strength to appreciably restrain free competition in the market.

19. We, of course, express no opinion on whether the Government, or a person not a party to the reciprocal dealing, could maintain an action under § 1 of the Sherman Act based on the agreement between Royster and Columbia.

Act. The district court struck the defense and entered summary judgment for the unpaid purchase price and storage charges less the amount obtained by the sale of the 37 cars. The Supreme Court affirmed, restating the settled principle that "the Sherman Act's express remedies could not be added to judicially by including the avoidance of private contracts as a sanction." 358 U.S. at 519, 79 S.Ct. at 431. The Court further concluded that only where "the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act" may the defense of illegality be interposed. 358 U.S. at 520, 79 S.Ct. at 432. With reference to the argument that the sale and the agreement to fix prices were indivisible, it said:

"[W]here, as here, a lawful sale for a fair consideration constitutes an intelligible economic transaction in itself, we do not think it inappropriate or violative of the intent of the parties to give it effect even though it furnished the occasion for a restrictive agreement of the sort here in question." 358 U.S. at 521, 79 S.Ct. at 432.

Here, as in *Kelly*, the sale was "an intelligible economic transaction in itself," the price was fair, and the terms were voluntarily accepted. By the time Royster brought this action, the parties had terminated their reciprocal dealing, and the award of damages to Royster can not exclude competitors. We conclude, therefore, that the district court did not err in refusing to charge the jury on Columbia's affirmative defense of non-coercive reciprocity.[20]

## VII.

Although we have assumed for the purposes of this case that the non-coercive reciprocal agreement disclosed by the record violated § 1 of the Sherman Act, Columbia cannot recover on its counterclaim. Voluntary participation in an agreement, uninfluenced by eco-nomic domination of one party over the other, is inherent in the concept of non-coercive reciprocal dealing. Since the jury's verdict disposed of the issue of coercive reciprocity, Columbia is limited in pressing its non-coercive theory of recovery to evidence disclosing the voluntary, joint participation and equal fault of the parties.

The most recent authority touching this aspect of the case is Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 140, 88 S.Ct. 1981, 1985, 20 L.Ed.2d 982 (1968), where the Court broadly stated "that the doctrine of in pari delicto * * * is not to be recognized as a defense to an antitrust action." That case, however, involved opponents of decidedly unequal strength enmeshed in an illegal scheme. The plaintiffs, the Court noted, "participated to the extent of utilizing illegal arrangements formulated and carried out by others * * * [but] their participation was not voluntary in any meaningful sense." 392 U.S. at 139, 88 S.Ct. at 1985. Recognizing that the scheme had been thrust upon the plaintiffs, offering them no choice but to cooperate, Mr. Justice Black speaking for the Court said:

"We need not decide * * * whether * * * truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of pari delicto, for barring a plaintiff's cause of action * * *." 392 U.S. at 140, 88 S.Ct. at 1985.

Columbia's counterclaim is the type of case the Court expressly excluded from the scope of its opinion. Separate opinions in *Perma Life* representing the views of five of the members of the Court, however, provide guidance for the resolution of this issue. These opinions teach that when parties of substantially equal economic strength mutually participate in the formulation and execution of the scheme and bear equal re-

20. Because the jury's verdict settled the issue of coercive reciprocity, we find no occasion to express an opinion about the application of Kelly v. Kosuga to the defense of coercive reciprocal dealing. *Cf.* Associated Press v. Taft-Ingalls Corp., 340 F.2d 753, 768 (6th Cir. 1965) (tying arrangement).

**16**

sponsibility for the consequent restraint of trade, each is barred from seeking treble damages from the other.[21]

 We think it plain, therefore, that a party, who voluntarily formulates and equally participates in a non-coercive agreement for reciprocal dealing until a declining market makes its purchases unprofitable, cannot maintain an action under § 1 of the Sherman Act against its trading partner. *See* Premier Electrical Construction Co. v. Miller-Davis Co., 422 F.2d 1132, 1138 (7th Cir. 1970) (dictum). Accordingly, we conclude the district court committed no error by declining to instruct the jury that Columbia could recover on its counterclaim if it proved a non-coercive agreement for reciprocal dealing.

With respect to all the antitrust issues, the judgment of the district court is affirmed. The judgment for Royster on the contract is vacated, and the case is remanded for further proceedings consistent with this opinion. Each party shall bear its own costs.

---

21. *See* 392 U.S. at 146, 147, 149, and 156, 88 S.Ct. 1981.