[Civ. No. 2460. Fifth Dist. July 7, 1976.]

HEGGBLADE-MARGULEAS-TENNECO, INC.,
Plaintiff and Appellant, v.
SUNSHINE BISCUIT, INC., et al., Defendants and Respondents.

## COUNSEL

Mack, Bianco, Means, Mack & Stuart and H. C. Mack, Jr., for Plaintiff and Appellant.

Lawler, Felix & Hall, Orville O. Orr, Jr., and Richard E. Plymale for Defendants and Respondents.

## OPINION

**FRANSON, Acting P. J.—**

### STATEMENT OF CASE

Heggblade-Marguleas-Tenneco (HMT) filed a complaint for breach of two contracts against Sunshine Biscuit, Inc. The complaint alleged the contracts were entered into on October 15, 1970. One contract was with Blue Bell Potato Chip Company to deliver 5,000 cwt. sacks of Kennebec potatoes between May 15 and July 15, 1971, at $2.35 per bushel and $2.60 per sack. The other contract was with Bell Brand Foods, Inc. to deliver 95,000 cwt. sacks of Kennebec potatoes between May 15 and July 15, 1971, at $2.35 per cwt. The complaint alleged that only 60,104.9 sacks were taken and that HMT had suffered resulting damages of $87,000.[1]

---

[1]Bell Brand Foods, Inc. is a wholly owned subsidiary of Sunshine Biscuit, Inc. Blue Bell Potato Chip Company is a division of Sunshine Biscuit, Inc. For convenience both companies will be referred to as Bell Brand.

Sunshine Biscuit, Inc. answered, admitting the existence of the contracts but that: "Because it was impossible for [Bell Brand] to predict or reasonably foresee at the time the contracts . . . were executed the exact number of processing potatoes [it] would require during the period May 15 through and including July 15, 1971, it was understood and agreed . . . , as is customary in the potato processing industry, that the number of potatoes specified in each of said contracts were reasonable estimates of the respective requirements of [Bell Brand] only during said period, and did not constitute the exact number of potatoes to be ordered by [Bell Brand], . . . , and delivered by plaintiff under said contracts."

A jury returned a verdict for respondents.

HMT moved for a new trial on the ground that evidence of a trade custom should not have been considered by the jury. The motion was denied and appellant filed a timely notice of appeal.

## THE FACTS

Heggblade-Marguleas-Tenneco resulted from two mergers: the Kern County Land Company (KCL) merged with Tenneco in 1967, and Heggblade-Marguleas Company merged with Tenneco in March 1970. Prior to the merger, Heggblade-Marguleas Company had been engaged in the business of marketing agricultural products for different companies, including KCL. Heggblade-Marguleas had never marketed processing potatoes. KCL had grown processing potatoes but had never marketed them. After the 1970 merger, Heggblade-Marguleas took over the agricultural operations of KCL.

In May 1970, HMT studied the feasibility of growing and marketing processing potatoes. HMT decided that they should plant between 1,000 and 2,000 acres of potatoes for the spring 1971 harvest and market them to processors.

Bell Brand had been engaged for many years in the production of potato-snack foods, such as chips and French fries.

John Thomas, executive vice-president of HMT, met with Lon Doty, president of Bell Brand, at the Bell Brand plant in Los Angeles in July or August 1970. At that meeting, the parties tentatively agreed that HMT would sell to Bell Brand 100,000 sacks of potatoes to be delivered

between May 15 and July 15, 1971. Mr. Thomas understood that the figure mentioned by Mr. Doty at the meeting was variable because of Bell Brand's commitments to its other customers. Thomas told Doty that HMT would overplant "a little bit" since this would be their first contract and they wanted to be sure they could produce the quantity needed.

Mr. Thomas received a letter from Mr. Doty on August 10, 1970, which read in part: "After analyzing our needs and obligations to those people who have performed well for us in the past, we would like to start with you on the basis of obtaining 100,000 sacks of Kennebec potatoes from your operation between May 17 and July 17, 1971. The price would be $2.35 in one ton bins. Should you decide to proceed on this basis, we would give you an approximate daily requirement of commercials, bakers and B's for proper planning through this period. This arrangement would balance our needs with the opportunity for you to perform directly for us and evaluate our relationship. At the same time, it would enable us to do what we have always done in the past—maintain our loyalty to those who have served us well in the past."

Thomas replied by letter on August 31, 1970: "Just a note to let you know that we are going ahead with our contract to furnish you 100,000 sacks of Kennebec potatoes between May 17 and July 17, 1971, as per your letter of August 10. We have purchased some very fine seed from Utah and have picked our best land in Kern County for we want to be sure to effect the best delivery possible."

Doty was aware that HMT had had no prior marketing experience with processing potatoes. Thomas testified that while he understood that the quantity term agreed upon would not be exact to the last sack of potatoes he believed that the amount taken by Bell Brand would be fairly close to the contract term. Doty did not mention to Thomas that the quantity term was merely an estimate.

Jean Smith, potato buyer for Bell Brand, became concerned after reading Doty's letter to Thomas stating that the quantity was too high. Smith talked to Thomas at least twice concerning a reduction of the quantity and was advised in early October that HMT had already procured the seed necessary to produce the specified amount. On October 17, 1970, Smith went to Thomas' office for the purpose of executing Bell Brand's form contract at a reduced figure. At that meeting

Thomas told Smith that he considered the two letters between him and Doty as a contract, so Smith executed the formal contracts in conformity with the letters.[2]

In September 1970, HMT approached Heinie Hoffman, who had over 20 years' experience in the processing potato industry. Hoffman was hired by HMT effective October 1, 1970, to obtain more marketing contracts for their potatoes and to assist in selling the potatoes HMT was planning to grow. Hoffman signed the formal contracts for HMT on October 17, 1970.

Hoffman, Smith and Gary Riopelle, president and general manager of Bell Brand, testified that because the contracts are executed eight or nine months before the harvest season, the custom in the processing potato industry is to treat the quantity solely as a reasonable estimate of the buyers' needs based on their customers' demands and the growers' ability to supply based on the anticipated yield for the delivery period.

Because of a decline in demand for Bell Brand products in May through July 1971, Bell Brand's sales for the late spring and summer of 1971 were down substantially. As a result, Bell Brand's need for potatoes from its suppliers was severely reduced, and it prorated the reduced demand among its suppliers, including HMT, as fairly as possible. By the end of the harvest season, Bell Brand was able to take only 60,105 cwt. sacks from HMT on the two contracts.

---

[2]Mr. Smith testified as follows:

"A. ... I told him that I was going to have problems, we hadn't executed the contract yet, and at that point I had heard, it was hearsay, but they had not secured their seed yet, so I felt that there was no reason why I couldn't get the contract reduced if they hadn't gotten their seed. However he did advise me that they did have their seed and then at a later date it was brought up again and it was actually brought up on the date that the contract was executed.

". . . . . . . . . . . . . . . . .

"A. No, I went up there and I was still protesting and John Thomas brought out the letter and he said, well, I don't care whether we negotiate your formal contract or not because this constituted a contract as far as I am concerned, so I proceeded to execute the contract in conforming [*sic*] with the letter.

"Q. So you were advised both in your prior telephone conversation with Mr. Thomas and also personally by him in his office the day the contract was signed that as far as he was concerned they already had a deal with Mr. Doty and they had a contract and they were going to stand on that?

"A. That is right. I made the remark to him, I said, well, I know we're going to have problems, and he said, well, Jean, you've got the reputation of working anything out and I said, well, good luck to him and I walked out."

## DISCUSSION

Appellant contends that the quantity terms in the contracts are definite and unambiguous, hence it was error to admit into evidence the custom of the processing potato industry that the amounts specified are reasonable estimates. Appellant's contention is without merit.

California Uniform Commercial Code section 2202 states the parol evidence rule applicable to the sale of personal property:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented.

"(a) By course of dealing or usage of trade (Section 1205) . . . ."[3]

California Uniform Commercial Code section 2202, subdivision (a), permits a trade usage to be put in evidence "as an instrument of interpretation." (Cal.U.Com.Code, com. 2, West's Com. Code Ann., p. 154.) The Uniform Commercial Code comment to subdivision (a) of section 2202 states that evidence of trade usage is admissible ". . . in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that . . . the usages of trade were taken for granted when the document was phrased. Unless *carefully negated* they have become an element of the meaning of

---

[3] "Usage of trade" is defined and explained in California Uniform Commercial Code section 1205 as:

"(2) . . . any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. *The existence and scope of such a usage are to be proved as facts.* . . .

"(3) . . . any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware *give particular meaning to and supplement or qualify terms of an agreement.*

"(4) The express terms of an agreement and an applicable . . . usage of trade shall be construed *wherever reasonable as consistent with each other;* but when such construction is unreasonable express terms control . . . usage of trade . . . .

"(5) An applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performance." (Italics added.)

the words used. Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean." (Cal.U.Com.Code, com. 2, West's Com. Code, p. 155. Italics added.)

A case factually similar to the instant case is *Columbia Nitrogen Corporation* v. *Royster Company* (4th Cir. 1971) 451 F.2d 3. There the seller sued the buyer for breach of contract for the purchase of a specified quantity of phosphate. The buyer's defense was a trade usage which imposed no duty to accept at the quoted prices the minimum quantity stated in the contract. The trial court had excluded this evidence because ". . . 'custom and usage . . . are not admissible to contradict the express, plain, unambiguous language of a valid written contract, which by virtue of its detail negates the proposition that the contract is open to variances in its terms. . . .' " (451 F.2d at p. 8.) The Court of Appeal interpreted Virginia Uniform Commercial Code section 2-202, which is identical to California Uniform Commercial Code section 2202, subd. (a), as meaning that where the contract does not expressly state that trade usage cannot be used to explain or supplement the written terms, the evidence of trade usage should be admitted to interpret the contract. "The contract is silent about adjusting prices and quantities to reflect a declining market. It neither permits nor prohibits adjustment, and this neutrality provides a fitting occasion for recourse to usage of trade and prior dealing to supplement the contract and explain its terms." (451 F.2d at pp. 9-10.)

We find *Columbia Nitrogen Corporation* persuasive. Under subdivision (a) of section 2202, established trade usage and custom are a part of the contract unless the parties agree otherwise. Since the contracts in question are silent about the applicability of the usage and custom, evidence of such usage and custom was admissible to explain the meaning of the quantity figures.

Appellant contends that because Mr. Thomas did not understand that the quantity figure was an estimate, the trade custom must be excluded from the contract. However, the testimony that Thomas refused to reduce the quantity as Smith had requested does not negate the applicability of the custom as a matter of law. The Thomas-Smith negotiations give rise to conflicting inferences: either that Smith agreed to Thomas' assertion that the quantity was fixed and not subject to later

adjustment, *or* that regardless of Thomas' protestations, Smith intended, and Thomas understood the quantity was an estimate only. Smith had told Thomas earlier that the 100,000-sack figure was too high, thereby giving Thomas notice that Bell Brand might not be able to process that amount of potatoes the following spring. Yet, when the formal contracts were executed on October 17, 1970, nothing was inserted in the contracts suggesting that the quantity was "fixed" or "firm." From this omission, a reasonable inference arises that when Smith signed the contracts on behalf of Bell Brand he intended the 100,000 figure to be an estimate and that Thomas understood this to be so.

Because the credibility of the witnesses and the meaning to be given to contradictory inferences arising from evidence extrinsic to the terms of a written contract are for the trier of fact, a factual question was created for the jury as to whether the parties intended to exclude the custom from the contract.[4]

■ Appellant's argument that the evidence of custom should not have been considered by the jury in interpreting the contracts because the officers of HMT were inexperienced in the marketing of processing potatoes and lacked knowledge of the custom is similarly without merit. Mr. Hoffman was knowledgeable in the processing potato business and was aware of the trade custom. Since appellant pleaded that the contracts had been entered into on October 15, 1970, and Hoffman had been employed by HMT on October 1, 1970, his knowledge was imputed to HMT. (Civ. Code, § 2322.)

Moreover, persons carrying on a particular trade are deemed to be aware of prominent trade customs applicable to their industry. The knowledge may be actual or constructive, and it is constructive if the custom is of such general and universal application that the party must

---

[4]The jury was instructed that the trade custom and usage was part of the contract unless the parties excluded its application or intended otherwise. Special instruction No. 6-A requested by defendants provided: "You are instructed that the contracts . . . are to be read and interpreted on the assumption that the customs and usages of the processing potato industry were taken for granted when the contract was made, unless the parties carefully excluded the application of the trade customs and usages or they intended that they should not apply, then those customs and usages were, by law, incorporated into the contract and are an essential element of the meaning of the words used. . . ."

Appellant did not object to this instruction nor did it propose additional or clarifying instructions on the jury's use of the trade custom in interpreting the contracts; hence, any error in the instruction on this point must be deemed invited. (4 Witkin, Cal. Procedure (2d ed.) Trial, § 194, pp. 3013-3014.)

be presumed to know of it. (See *Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 483 [289 P.2d 785, 49 A.L.R.2d 496]; *Miller* v. *Germain Seed etc. Co.* (1924) 193 Cal. 62, 69 [222 P. 817, 32 A.L.R. 1215]; *Pastorino* v. *Greene Brothers* (1949) 90 Cal.App.2d 841, 845-846 [204 P.2d 368].)

KCL had been involved in farming for many years and had grown potatoes for processing. Heggblade-Marguleas had been involved in the marketing of agricultural products on a large scale although it had never marketed processing potatoes. Because potatoes are a perishable commodity and their demand is dependent upon a fluctuating market, and because the marketing contracts are signed eight or nine months in advance of the harvest season, common sense dictates that the quantity would be estimated by both the·grower and the processor. Thus, it cannot be said as a matter of law that HMT was ignorant of the trade custom.

We conclude that the trial court properly admitted the evidence of usage and custom to explain the meaning of the quantity figures in the contracts.

■ Appellant's final contention is that the trial court prejudicially erred in refusing to give the following instruction: "A party to a contract is not bound by a custom or usage in the trade or industry unless such party has knowledge, either actual or constructive, of such custom or usage. A party cannot be held to have constructive knowledge of such custom unless it is of such general and universal application *and he has been engaged in such industry for such period of time that he may be conclusively presumed* to know of it." (Italics added.)

While the first portion of the instruction is legally correct, that portion which states that the party to be bound by constructive knowledge must be engaged in the industry for a length of time is incorrect. (See *Miller* v. *Germain Seed etc. Co., supra,* 193 Cal. 62, 69; *Pastorino* v. *Greene Brothers, supra,* 90 Cal.App.2d 841, 846.) Because the instruction is not entirely correct, appellant has no standing on appeal to complain of the trial court's refusal to give the instruction. (*Hardin* v. *Elvitsky* (1965) 232 Cal.App.2d 357, 372 [42 Cal.Rptr. 748].)

Furthermore, the trial judge's notation on the jury instruction form indicates his belief that this subject had been covered by another

instruction which reads: "You are instructed that a 'custom' or 'usage of trade' means any practice or method of dealing having such regularity of observance in a place, location, or trade as to justify an expectation that it will be observed with respect to the transaction in question."

While it may be argued that this instruction is inadequate because of its failure to mention the requirement of actual or constructive knowledge, appellant did not offer other clarifying instructions. Again, to complain on appeal of a failure to instruct on a particular issue, the aggrieved party must request a *specific proper instruction*. (4 Witkin, Cal. Procedure (2d ed.) Trial, § 194, p. 3013.)

■ In any event, the giving of an erroneous instruction or failure to give a necessary instruction will not constitute reversible error if, under the pleadings and evidence, it is not reasonably probable that a different result would have been reached absent the error. (Cal. Const., art. VI, § 13; *Jacobs* v. *Bozzani Motors, Ltd.* (1952) 109 Cal.App.2d 681, 685 [241 P.2d 642].) In view of Hoffman's testimony that he was aware of the well-established trade custom in the processing potato industry, we cannot find it reasonably probable that a different verdict would have been reached had the jury been otherwise instructed. Therefore, any error in the instructions does not compel a reversal. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

The judgment is affirmed.

Goldstein, J.,* and Zeff, J.,† concurred.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.