Ralph F. HAMILTON, Appellant,

v.

George NEWBURY, Appellee.

No. 16852.

Court of Civil Appeals of Texas.

Dallas.

Feb. 3, 1967.

Rehearing Denied March 3, 1967.

C. Sidney McClain, Dallas, for appellant.

Edward V. Smith, III, of Golden, Croley, Howell, Johnson & Mizell, Dallas, Eugene A. Lalonde, Sidney, Mont., for appellee.

CLAUDE WILLIAMS, Justice.

The primary question presented by this appeal is whether a Montana court had jurisdiction to render an in personam judgment against a defaulting defendant, a Texas resident. George Newbury brought suit in the Seventh Judicial District Court of Richland County, Montana on May 22, 1964 against Ralph F. Hamilton in which he sought judgment upon a promissory note executed by Hamilton in the principal sum of $36,160, together with interest and costs. Personal service in said cause was had upon Hamilton, a resident of Texas, in Texas, on June 1, 1964. Defendant did not file an answer or make any appearance in the Montana court and thereafter on July 3, 1964 judgment by default was rendered in favor of plaintiff for the sum of $47,115.05, representing principal and interest on the note sued upon, together with costs.

This action was instituted in the district court of Dallas County, Texas by Newbury

against Hamilton based upon the Montana default judgment. Defendant answered and contended, inter alia, that the Montana judgment was void and of no force and effect since the Montana court rendering such judgment had never acquired jurisdiction over him. The case proceeded to trial before the court, without the intervention of a jury, and a judgment was rendered for plaintiff in the sum of $47,115.05, together with interest and costs.

The trial court filed findings of fact summarized as follows: Prior to the execution of the note which was the basis of the Montana action, and at all times thereafter, defendant Hamilton was a nonresident of the State of Montana and at all material times plaintiff Newbury was a resident of Montana. For a period of approximately ten years prior to the execution of the note sued upon, dated May 29, 1954, plaintiff had engaged in numerous business transactions with the defendant within the State of Montana. In some of these plaintiff participated as a principal, advancing money to defendant to cover plaintiff's participation, and in others plaintiff lent money to defendant. The Montana action was on a promissory note dated May 29, 1954, executed by defendant Hamilton payable to the order of plaintiff Newbury, in the principal sum of $36,710, bearing interest at 3 per cent per annum, and payable two years after date, and on which a total of $550 had been paid and credited prior to the institution of suit. The note sued upon in the Montana action was silent as to place of payment, but "the parties understood that it was to be repaid at Poplar, Montana, the residence of the plaintiff." The note of May 29, 1954 was given in renewal of a promissory note dated November 12, 1953, executed by defendant in favor of plaintiff, in the principal amount of $27,710, and further in consideration of an additional loan of $9,000 made to the defendant by the plaintiff in the spring of 1954. The note dated November 12, 1953 was executed in consideration of various loans made to defendant prior to November

12, 1953. The funds for each of the loans evidenced by the note dated November 12, 1953, were withdrawn by plaintiff in person at Poplar, Montana, from his checking account at the Trader's State Bank in Poplar, Montana, and were sent by wire from said town to defendant outside of Montana. On November 24, 1953 the defendant pled guilty to fraudulent use of the mail and fraud in the sale of securities in the Federal District Court in Billings, Montana, arising out of the sale to Montana investors of oil and gas rights in property located in Petroleum and Teton Counties in the State of Montana. The court deferred the imposition of the sentence conditioned upon the defendant making restitution to the Montana investors in the amount of approximately $30,000 then owing. During the years of 1953 and 1954 the defendant, in Montana, made restitution to the Montana investors in the sum of approximately $61,000. Part of the funds used in making restitution to the Montana investors came from the loans made by plaintiff to the defendant, which loans were evidenced by the note on which suit was brought in the Montana action. That defendant Hamilton was personally served in the Montana action in Dallas, Texas on June 1, 1964. Such service was in compliance with the applicable Montana statutes governing service of process on nonresident defendants and was the only service had on defendant in said cause. On July 3, 1964 plaintiff recovered judgment by default against Hamilton in the Montana action and that such judgment is a final, valid and subsisting judgment which has not been vacated or set aside in the State of Montana.

In his conclusions of law the trial court found: That the Montana judgment was valid and is entitled to full faith and credit by the courts of Texas under the Constitution and laws of the United States of America and the State of Texas; that the Seventh Judicial District Court of the State of Montana in rendering judgment against Hamilton had jurisdiction over the subject matter of the controversy and of the person of

Hamilton. That the applicable statutes of the State of Montana pursuant to which Hamilton was served in Texas on the Montana suit are constitutional and that acquiring jurisdiction over him in the manner provided by said statutes did not deprive Hamilton of due process and equal protection of the law. That defendant Hamilton had such contacts within the State of Montana "in connection with said note" as to constitute a proper basis for the assertion of jurisdiction over the person of defendant based upon personal service outside of the State of Montana and that the maintenance of the suit on said note under the circumstances "does not offend traditional notions of fair play and substantial justice." That the note sued upon in the Montana action had a substantial connection with the State of Montana.

Appellant assails the trial court's findings and conclusions, and the judgment rendered thereon, in thirty-five points of error, but concedes that the central question is that of jurisdiction vel non of the Montana court in rendering the judgment sued upon in Texas.

Basic and well established principles of law guide us in our resolution of the question thus presented.

■ Art. IV, Sec. 1, Constitution of the United States, provides that full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state. The Congress of the United States has prescribed the manner in which such judgments may be proved and the effect thereof in 28 U.S.C.A. § 1738. When a plaintiff sues upon a judgment of a sister state in Texas and introduces his judgment, authenticated as provided by 28 U.S.C.A. § 1738, he thereby establishes a prima facie case and it is not incumbent upon him to show any action by way of enforcement of the foreign judgment. Gard v. Gard, 244 S.W.2d 884, Tex.Civ.App.; Houston v. Dunn, 13 Tex. 476; Ryan v. City Nat'l Bank & Trust Co., Tex.Civ.App., 186 S.W.2d 747.

■ The burden of attacking the judgment and establishing reasons why it should not be given full faith and credit, such as lack of jurisdiction of the person of the defendant, shift to the defendant. Mendlovitz v. Samuels Shoe Co., Tex.Civ.App., 5 S.W.2d 559; Russell v. Butler, Tex.Civ. App., 47 S.W. 406.

The landmark case on the question of exercise of jurisdiction over a nonresident in an in personam judgment, is Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565, decided in 1877, in which the Supreme Court of the United States said:

"Since the adoption of the Fourteenth Amendment to the Federal Constitution, the validity of such [sister state] judgments may be directly questioned, and their enforcement in the State resisted, on the ground that proceedings in a court of justice to determine the personal rights and obligations of parties over whom that court has no jurisdiction do not constitute due process of law."

The Supreme Court then laid down two cardinal principles: (1) A personal judgment is void if it is rendered by a court which has no jurisdiction over the defendant; and (2) if a court has no jurisdiction over a nonresident defendant, it cannot acquire jurisdiction merely by serving process upon him outside the forum.

This continued to be the law for many years but then, due to changing times and conditions, the courts in a series of decisions, have diluted the Pennoyer doctrine to some extent. In 1945 the Supreme Court of the United States in International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057, said:

"Historically the jurisdiction of courts to render judgment in personam is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding

him. Pennoyer v. Neff, 95 U.S. 714, 733, 24 L.Ed 565. But now that the capias ad respondendum has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

In 1957 the Supreme Court of the United States continued the erosion of the Pennoyer doctrine in McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed. 2d 223, saying:

"Since Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565, this Court has held that the Due Process Clause of the Fourteenth Amendment places some limit on the power of state courts to enter binding judgments against persons not served with process within their boundaries. But just where this line of limitation falls has been the subject of prolific controversy, particularly with respect to foreign corporations. In a continuing process of evolution this Court has accepted and then abandoned 'consent', 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over such corporations. * * *

"Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.

"Turning to this case we think it apparent that the Due Process Clause did not preclude the California court from entering a judgment binding on respondent. It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State."

In 1958, speaking through Mr. Chief Justice Warren, the United States Supreme Court in Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, slackened the speed of the trend away from the Pennoyer doctrine when, after discussing in detail the opinion of the court in McGee v. International Life Ins. Co., supra, said:

"But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. See Vanderbilt v. Vanderbilt, 354 U.S. 416, 418, 77 S.Ct. 1360, 1362, 1 L.Ed.2d 1456. Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a conseqence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him."

The court went on to find that the facts in that case failed to reveal such minimal contacts as would give jurisdiction to the foreign state over a resident of Florida. The court concluded:

"The cause of action in this case is not one that arises out of an act done or transaction consummated in the forum State. * * * The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will

vary with the quality and nature of the defendant's activity, *but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.* International Shoe Co. v. State of Washington, 326 U.S. 310, 319, 66 S.Ct. 154, 159, 90 L.Ed. 95." (Emphasis supplied.)

Our Supreme Court, in O'Brien v. Lanpar Co., Sup., 399 S.W.2d 340, applied this rule in a case involving an Illinois judgment against a Texas resident. There the Texas resident had gone to Illinois and employed O'Brien, an attorney, to institute an action in Illinois. O'Brien brought an action in Illinois to collect his attorney's fees. The Supreme Court held that the action was one which arose out of and was a part of the very contact for which Lanpar's agent visited Illinois. The court pointed out that the "contact was substantial rather than casual or fortuitous," and that it was made in the State of Illinois.

Again in Nyman v. Schnitzer, Tex.Civ. App., 405 S.W.2d 120 the court upheld jurisdiction of a New York court which had awarded judgment in favor of a New York resident for dental services performed in New York. The Texas court held that there was a definite contact within the State of New York which would confer jurisdiction on the Texas resident.

The Montana "long-arm" statute which governed the validity of the Montana judgment is Montana Rules of Civil Procedure, Rule 4B(1) which authorizes out of state personal service on a nonresident defendant on "any claim for relief arising from the doing personally, through an employee, or through an agent, of any of the following acts: (a) the transaction of any business within this state".

In the light of these authorities the question to be resolved is whether the promissory note sued upon in Montana in this case amounted to the "transaction of any business" within Montana. Or, stating it in the language of the United States Supreme Court in Hanson v. Denckla, supra, does this record demonstrate that appellant Hamilton purposefully availed himself of the privilege of conducting activities within Montana by the making and giving of the note sued upon, thus invoking the benefits and protections of the Montana laws. To seek a solution to this question, and especially in the light of appellant's "no evidence" and "insufficient evidence" points of error directed toward the trial court's findings of fact supporting the judgment, we have been required to carefully review the entire record in this case. This we have done in the light of the often repeated rule announced by our Supreme Court in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, and Brown v. Frontier Theatres, Inc., 369 S.W.2d 299.

A fair summarization of the material evidence revealed by this record is as follows:

Ralph Hamilton testified that the promissory note made the basis of the Montana action was executed by him, as maker, in the Lewis & Clark Hotel at Mandan, North Dakota on May 29, 1954 and that Mr. Newbury, the payee, was present with him when the note was executed and delivered in North Dakota. The note itself, introduced in evidence, is on a printed form and shows to have been in the principal sum of $36,710, dated May 29, 1954 and payable two years after date to the order of George Newbury with interest at 3 per cent. The note contains the wording, "Payable at ————." Hamilton testified that he had previously received from Newbury the following sums of money: August 1953, $14,500; October 1953, $1,460; November 1953, $2,750; and November 10, 1953, $9,000, making a total of $27,710. He said that on November 12, 1953 he had given Newbury a receipt for the sum of $27,710. Later, on May 3, 1954, he received an additional $9,000 from Newbury, which sum, when added to $27,710 approximated the

sum of $36,710. The receipt dated November 12, 1953 has a notation signed by George Newbury indicating that the amount of the receipt, $27,710 plus $9,000, or a total of $36,710, was evidenced by "Note of $36,710.00 given May 29th, 1954 cansells (sic) this out. George Newbury". Hamilton testified that none of the money representing the various amounts referred to above was ever received by him from Newbury in Montana but was received in North Dakota where he was buying oil and gas leases. The receipt and note were both given Newbury in North Dakota. Hamilton related that he had not transacted or conducted any business of any kind in Montana since 1949 or 1950. He said that he and Newbury were close friends and that Newbury and his wife stayed with him and his wife in North and South Dakota a great deal of the time in 1954. He admitted that he had transacted business in Montana with Newbury in years gone by but that none of the money evidenced by the promissory note in question had been received by him prior to August 1953. Hamilton's testimony in this regard is substantiated by the record of Newbury, in his own handwriting, which indicates the various dates and amounts shown to have been "Wired money to Ralph. Loan".

Hamilton admitted that he had been indicted in the United States District Court, Billings, Montana Division, in connection with use of government mails to defraud, said indictment shown to have been returned by the grand jury on October 1, 1952. He also admitted that he had received a sentence of five years, November 24, 1953, but that the United States District Judge had probated the sentence upon the condition that he would make restitution to the investors "the sum of $30,000.00 now due, or approximately that amount, within the next year." He stated that he had made partial restitution in the amount of approximately $15,000 in 1953, paying same by cashier's checks which he had purchased in

July 1953. He was positive that this money had been returned to the investors prior to the time that he had received the money from Mr. Newbury in August 1953. He further testified that he completed making restitution to the investors in the fall of 1954, the total amount of restitution being $61,800, and being money belonging to him entirely. He denied that any part of the money which came from Newbury and evidenced by the promissory note in issue went to pay off any of the restitution provision of the federal judgment against him.

Mrs. Hamilton testified that her husband had purchased cashier's checks on July 28, 1953 in the sum of $16,800 which were used to make restitution to the various investors involved in the federal court indictment. She testified the next payments were made in October and November of 1954 in the sum of $44,000 and that all of this money came out of the personal funds of her husband. She testified that none of the money used for restitution came out of the money loaned by Newbury to Hamilton and evidenced by the promissory note in question. She testified that she and her husband were in North and South Dakota on all of the dates involved in the loans from Newbury which were eventually brought forward in the promissory note sued upon.

Newbury testified that all of the money he loaned Hamilton came from his bank in Poplar, Montana and that according to his records, which he said were accurately kept, the money was wired to Hamilton. He admitted that he was in North Dakota when the note was signed and also when he gave Hamilton the last $9,000. Mr. Newbury testified that he did not know what Mr. Hamilton used this money for. Over objection of counsel Mr. Newbury was asked and permitted to answer the following question:

"Q. The question, George, is where did you expect to be paid the money which you had lent to Mr. Hamilton?

"A. It would be in Montana where I lived."

A careful evaluation of the testimony admitted before the trial court leads to the definite conclusion that appellant Hamilton was successful in proving lack of jurisdiction of the Montana Court to render the judgment against him and therefore same is unworthy of full faith and credit in our courts. We believe that the testimony reveals an absence of that "minimum contact" on appellant Hamilton within the State of Montana which is made essential by the above authorities. Hamilton was not a resident of Montana; he had not transacted any business in Montana since 1950 and none of that had any connection with the promissory note sued upon; the note in question was executed in North Dakota and not payable in Montana; and he was not served with process in the State of Montana. Accordingly, the essential element of "transaction of any business within this state", as provided by the Montana "long-arm" statute, is lacking.

Appellee, while admitting that there is no direct evidence to support his contention, earnestly argues that the circumstantial evidence supports the trial court's finding that Hamilton utilized at least a part of the funds borrowed from Newbury to make restitution of the federal court's judgment. We cannot agree. It is true that as a general rule the uncontradicted evidence from an interested witness cannot be considered as doing more than raising an issue of fact. However, this general rule is subject to the exception that when such testimony is clear, direct and positive and there are no circumstances in evidence tending to discredit or impeach such testimony it should be taken to be true, as a matter of law. Great American Reserve Ins. Co. v. San Antonio Plumbing Supply Co., Tex.Sup.Ct., 391 S.W.2d 41; Cochran v. Wool Growers Central Storage Co., 140 Tex. 184, 166 S.W.2d 904. The exception to the rule is especially true where the opposite party has the same means and opportunity of disproving the testimony, if it is not true, and fails to do so. Valley Stockyards Co. v. Kinsel, Tex.Sup.Ct., 369 S.W.2d 19; James T. Taylor and Son, Inc. v. Arlington Independent School District, 160 Tex. 617, 335 S.W.2d 371; McGuire v. City of Dallas, 141 Tex. 170, 170 S.W.2d 722. The testimony of Mr. and Mrs. Hamilton is clear, direct and positive. It is not impeached in any way or manner. In fact, much of his testimony is corroborated by the handwritten records of Newbury himself. The money used for restitution is shown to have been paid in two installments, one prior to the time Newbury loaned Hamilton the first item of money in August 1953 and the other item several months following the execution of the note in question, to-wit, October and November 1954. Newbury made no effort to refute this testimony but, as a matter of fact, testified that he did not have any idea or knowledge what Hamilton had done with the money which he loaned him.

Circumstantial evidence should not be of such a character as to admit only completely speculative conclusions. Williams v. Rearick, Tex.Civ.App., 218 S.W. 2d 225. If the probative force of evidence be so weak that it raises only a surmise or suspicion of the existence of the fact sought to be established, that evidence in legal contemplation is no evidence at all and will not support a finding which comprehends the existence of a disputed fact. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059; Austin v. Neiman, Tex.Com.App., 14 S.W. 2d 794. A presumption of fact cannot rest upon a fact presumed, or in other words, one presumption cannot be based upon another presumption nor an inference of fact upon other inferences. Houston Fire & Casualty Ins. Co., v. Biber, Tex.Civ.App., 146 S.W.2d 442.

We believe that the record in this connection reveals nothing more than suspicion, guess or surmise which does not

amount to probative evidence sufficient to raise an issue of fact. Accordingly, we hold that there is no legal evidence in this record to support the finding and conclusion on the part of the trial court that Hamilton utilized any part of the funds evidenced by the promissory note in question to make restitution to the Montana investors growing out of the federal court judgment. Should we be mistaken in this connection we hold that the evidence is wholly insufficient to justify such finding and conclusion and sustain appellant's points in that regard.

Appellee argues that appellant solicited loans from a Montana resident and that this is sufficient to confer jurisdiction. The record does not justify such contention. It is not demonstrated where Hamilton was when he sought the loans in question nor how he did this. The trial court found that the money was wired to Hamilton outside of Montana. The mere fact that the money may have come from a bank in Montana is not sufficient, in itself, to confer jurisdiction on a nonresident in an action of this kind.

Again, appellee relies upon the trial court's finding that "the parties understood" that the note was to be repaid at Poplar, Montana. There is no evidence to support this finding. The only testimony relating to place of payment of the note was from Newbury. He said that it was "his understanding" that the note would be payable in Montana. There is no evidence that such unilateral understanding was ever communicated to Hamilton or that there is any mutual agreement of payment in Montana. The note itself is silent as to place of payment. "It has been said that where no place of payment is designated in the note, the maker may designate the place; otherwise, it may be paid at the maker's place of residence, or place of business, unless there is something in the note to indicate the contrary." 10 C.J.S. Bills And Notes, § 441, p. 964. Under the Texas Negotiable Instruments Act, Art. 5937, Sec. 73, Vernon's Ann.Civ.St., presentment for payment of a promissory note is to be made at the place of payment, if specified in the instrument. Where no place of payment is specified and no address is given the instrument is to be presented at the usual place of business or residence of the person to make payment. See also 9 Tex.Jur.2d § 179, p. 203. It is our opinion that there is no evidence, or the evidence is wholly insufficient, to support the court's finding and conclusion with reference to place of payment and appellant's points with reference thereto are sustained.

Appellee points to the fact that appellee and appellant had a long history of past business dealings within the State of Montana. This, of course, is true but there is no evidence that Hamilton transacted any business with Newbury in Montana later than 1950. The note made the basis of this litigation came into being in North Dakota in 1954 and the funds represented therein came to Hamilton beginning in August 1953.

We sustain all of appellant's "no evidence" and "insufficient evidence" points which challenge the trial court's findings and conclusions relating to jurisdiction of the Montana court over appellant. This renders it unnecessary that we consider or pass upon appellant's points 32, 33, 34, and 35 in which he attacks the constitutionality of the Montana statutes involved.

The judgment of the trial court is reversed and here rendered that appellee take nothing from appellant by his cause of action.

Reversed and rendered.