**MODINE MANUFACTURING COMPANY, Appellant,**

v.

**NORTH EAST INDEPENDENT SCHOOL DISTRICT et al., Appellees.**

No. 7514.

Court of Civil Appeals of Texas, Beaumont.

Nov. 29, 1973.

Rehearing Denied Jan. 10, 1974.

Second Rehearing Denied Jan. 31, 1974.

**834**

Matthews, Nowlin, Macfarlane & Barrett, San Antonio, for appellant.

Foster, Lewis, Langley, Gardner & Hawn, Gresham, Davis, Gregory, Worthy & Moore, Brite, Drought, Bobbitt & Halter, San Antonio, for appellees.

KEITH, Justice.

Defendant below appeals from an unfavorable judgment rendered in a suit upon a contract.

### 1. *Nature and Result of Suit*

North East Independent School District (hereinafter "School District") brought suit against Modine Manufacturing Company ("Modine") and Langhammer-Fincke-Hall, Inc. ("LFH") for damages resulting from the repudiation by Modine of an alleged contract to provide air conditioning equipment to School District. It also named Jud Plumbing & Heating Company, Inc. ("Jud") as a party defendant. School

District also sought judgment declaring that Modine and LFH were obligated to indemnify it for any damages awarded to Jud against the School District as a result of Modine's repudiation of the alleged contract to supply the equipment.

Jud filed a cross-action against Modine, LFH, and School District seeking recovery of damages sustained in performing its contract to install air conditioning equipment in the schools after Modine's repudiation of the alleged contract to supply the equipment.

LFH filed a cross-action against Modine seeking a sales commission upon the price of the equipment mentioned in the alleged contract and indemnity for any liability to which it might be subjected by any other party in the actions arising out of the contract.

Modine denied that it was a party to the alleged contract; but, alternatively, counterclaimed against School District, contending that it had wrongfully refused to accept Modine's equipment. It also filed a cross-action seeking indemnity or contribution from LFH.

After trial to a jury, the court entered a judgment:

1. For School District against Modine for $46,026, plus attorney's fees of $20,000;

2. For Jud against School District and Modine, jointly and severally, for $61,000, plus attorney's fees of $16,500 for which Modine was solely liable; and School District was awarded indemnity against Modine for the $61,000 recovered by Jud;

3. For LFH against Modine for sales commission of $7,863.15, plus attorney's fees of $8,670.

4. Modine was denied all relief it sought.

Only Modine has perfected an appeal from the judgment and no appellee has protective cross-points assigned.

Modine has appealed with a lengthy brief containing 85 points of error that present a myriad of issues based upon a statement of facts containing over 2200 pages, along with approximately a hundred exhibits, many of which are voluminous. It is obvious that, while we must make a lengthy statement from the record, many facets thereof will escape mention.

### 2. The Controversy Develops

School District, having floated a bond issue for the purpose of air conditioning its schools, retained an engineering firm to prepare plans and specifications for the equipment to be used in such project. The intent of this maneuver was to procure volume prices for the equipment needed so that such prices would be used by the installation contractors in their bids on the overall project. For many years prior to the events leading up to this suit, LFH had been Modine's sales representative in the San Antonio area under the terms of a specific written agreement.

LFH, being interested in selling Modine equipment, obtained the plans and specifications from School District's engineer, went to Modine's home office to consult with executive personnel of Modine and prepared a bid for the supply of Modine equipment on a part of the total project, its bid being slightly in excess of $157,000. Before the formal bid was submitted on May 5, 1969, one of Modine's executives came to San Antonio and conferred with LFH on the details of the bid and actually accompanied LFH's representative to the engineer's office where the bids were opened.

The bid forms specified that the equipment would be furnished "on manufacturer's standard conditions of sale" and recited that a copy thereof was attached to the proposal. Our record is not clear whether the copy was actually attached to the proposal but, in any event, the engineer received a copy within a few days thereafter

Shortly thereafter, the engineer advised the total work bidders that the LFH bid for Modine equipment had been accepted and advised such total work bidders that Modine's equipment at the bid price should be included in their bids. LFH then sent a copy of the original proposal to the total work bidders for their use in preparing their bids.

School District's superintendent advised Modine on May 20 that the School District intended to award a contract in June for the air conditioning of its schools and would include the Modine units as bid on May 5. A Modine official then wrote to the superintendent asking that he sign the enclosed copy of a letter which bound the School District to issue a purchase order on the Modine equipment no later than June 23 and accept equipment by August 23, 1969. The superintendent signed and returned such letter. Meanwhile, LFH learned that Modine's equipment was low in "sensible heat capacity" but felt that it could secure the engineer's waiver of strict compliance and continued its work on the proposal.

Jud, having received the contract to install the equipment as the "total work bidder" on June 19, issued its purchase order to Modine on June 20 for the equipment specified in the May 5 bid made through LFH. Modine, learning of the claimed deficiencies in its equipment, sent several of its executives to San Antonio to confer with the engineers in an effort to procure a waiver of the requirement or a modification of the equipment which would satisfy the engineer.

The engineer refused to waive the strict requirement of the contract and the parties then discussed a modification of Modine's equipment so as to comply with the literal requirements of the specifications. For reasons of its own, Modine decided against the modifications the parties had discussed; and, on July 28, 1969, notified the engineer (and later Jud) that it was refusing to accept Jud's purchase order and would not supply the units mentioned in its bid.

After notifying Modine that it would take such steps as it could to protect itself, the School District advertised for new bids on the equipment and, again, Modine entered a bid but it was not accepted. The School District then awarded the bid to another manufacturer at a higher price and its equipment was installed in the schools. School District then instituted the suit which underlies this appeal.

### 3. The Jury Findings

The jury found that LFH, in submitting the May 5 bid, intended to act as an agent of Modine; that it had actual authority to act as Modine's agent as well as apparent authority; that School District accepted the May 5 bid; that Modine agreed to furnish and deliver the equipment by requiring School District's superintendent to sign its letter of June 2, 1969, and, in so doing, Modine agreed to accept a purchase order for the equipment from the successful total bidder on the job; that Modine ratified LFH's May 5 bid; that Modine's equipment was not in accordance with the engineer's specifications. The jury failed to find that it was the intention of the parties that the agreement to furnish the equipment was subject to the terms and conditions of its contract with LFH.

The jury also found that in submitting the equipment quotations to Jud, LFH intended to act as the agent of Modine, and had actual as well as apparent authority to act as agent for Modine. It also found as a fact that Modine did not give written notice to Jud of its objections to its purchase order within ten days after it was received. The increased cost to Jud, because of the refusal to furnish Modine equipment, was found to be $61,000, which could not have been reasonably prevented by Jud, and that Modine knew that its repudiation of the contract would result in increased costs to Jud.

Damages incurred by the School District because of Modine's repudiation of the contract were fixed at $46,026. We reserve discussion of the several awards of attorney's fees until later in the opinion.

The trial court overruled Modine's motions for judgment non obstante veredicto and to disregard certain of the findings, and the judgment followed the verdict.

### 4. Long-arm Jurisdiction Over Modine

■ We turn first to a consideration of point 80 contending that Modine, a foreign corporation, was not doing business in Texas and was not amenable to the in personam jurisdiction of the trial court. If sustained, this point would be dispositive of the entire litigation. School District's petition contained the necessary jurisdictional allegations to invoke the long-arm jurisdiction of the trial court under the provisions of § 3, Art. 2031b, Vernon's Ann.Civ.St. McKanna v. Edgar, 388 S.W.2d 927, 930 (Tex.1965).

We will have occasion later in this opinion to discuss in detail the activities *in Texas* of some of Modine's officials. At this point, it is sufficient to state that Modine had a sales representative in San Antonio, LFH, which had made many contracts of sale of Modine equipment. In the instant case, before bids were submitted, a Modine official came to San Antonio to discuss the project with School District's engineer; he helped put together the Modine bid proposal submitted by LFH; and Modine officials were in almost constant touch with officials of LFH concerning the bid proposal. Considering the totality of the circumstances, we are of the opinion that Modine had more than the necessary minimum contacts in Texas so that the maintenance of this suit does not offend " 'traditional notions of fair play and substantial justice.' " International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945). Further, the evidence convinces us that the trial court had jurisdiction of defendant under

the tests laid down by Justice Pope in O'Brien v. Lanpar Company, 399 S.W.2d 340, 342 (Tex.1966). See also, Sun-X International Company v. Witt, 413 S.W.2d 761 (Tex.Civ.App., Texarkana, 1967, error ref. n. r. e.); Hamilton v. Newbury, 412 S.W.2d 801 (Tex.Civ.App., Dallas, 1967, error ref. n. r. e.); Uvalde Rock Asphalt Co. v. Consolidated Carpet Corp., 457 S.W.2d 649 (Tex.Civ.App., Beaumont, 1970, error ref. n. r. e.); Country Clubs, Inc. v. Ward, 461 S.W.2d 651 (Tex.Civ.App., Dallas, 1970, error ref. n. r. e.). Point 80 is overruled.

### 5. Custom and Usage of the Trade

■ Modine has a series of points complaining of the trial court's exclusion of testimony relating to custom and usage of the trade in the air conditioning industry. There are two basic facets of the case affected by these rulings by the trial court: (a) the exclusion of the evidence of experts that reasonable variations in cooling capacity are considered to comply with the specifications; and (b) the refusal to permit the jury to consider custom and usage with reference to approved submittal data.

The specifications incorporated into LFH's bid provided that "[c]apacities shall not be less than indicated" and the "Special Conditions" section contained this language:

> "Acceptance of materials and equipment under this provision shall not be construed as authorizing any deviations from the Specifications, unless the attention of the Engineer has been directed in writing to the specific deviations."

It seems undisputed in our record that Modine's equipment had an approximate 6% deficiency in "sensible heat capacity," i. e. the capacity to remove heat, measured in British Thermal Units, from the air. Nor does Modine contend that it called the engineer's attention thereto. Instead, relying upon the language found in §§ 1.205 and 2.202 of the Uniform Commercial

Code,[1] it tendered evidence as to custom and usage in the air conditioning industry.

It is provided in § 1.205(b) :

"A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts."

Our attention is also called to the language in § 2.202 and Comment 2 thereunder, Modine quoting the entire comment and School District emphasizing the negative aspect thereof.

These provisions of the modern code are not new to the case law of our state. As early as 1888 in Dwyer v. City of Brenham, 70 Tex. 30, 7 S.W. 598, 599, the Court held:

" '[W]here there is nothing in the agreement to exclude the inference, the parties are always presumed to contract in reference to the usage or custom which prevails in the particular trade or business to which the contract relates; and the usage is admissible for the purpose of ascertaining with greater certainty what was intended by the parties.' "

This clear statement of the law has been followed through the years and the rationale has been applied in many cases. E. g., City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex.1968) ; Gulf Production Co. v. Cruse, 271 S.W. 886, 887 (Tex.Com.App., 1925) ; Asgrow Seed Company v. Gulick, 420 S.W.2d 438, 442 (Tex.Civ.App., San Antonio, 1967, error ref. n. r. e.) ; and Rosenstock v. Wheeler, 310 S.W.2d 350, 354 (Tex.Civ. App., Houston, 1958, error ref.).

Several of Modine's witnesses, all of whom were qualified to testify on the subject, testified that reasonable variations in cooling capacity were considered to comply with specifications. They did admit, however, that what consisted of a "reasonable variation" was largely in the discretion of the engineer on the project. The proffered testimony was excluded on the ground that it was an attempt to vary the terms of a written instrument and their answers appear only in the bills of exception.

School District, relying in part upon language found in § 1.205(d), U.C.C., contends that the express terms of the agreement were inconsistent with such custom and usage so that the express terms were controlling. ("Capacities shall not be less than indicated" meant just that and not 94% of the indicated capacity.)

One of the obvious purposes of the legislature in adopting the Uniform Commercial Code was to excise from the body of the law the cumbersome rules which had grown up through the years. Thus, it provided in § 1.102, U.C.C.:

"(a) This title shall be liberally construed and applied to promote its underlying purposes and policies.

"(b) Underlying purposes and policies of this title are

"(1) to simplify, clarify and modernize the law governing commercial transactions;

"(2) to permit the continued expansion of commercial practices through *custom, usage and agreement of the parties.*"

It is provided in § 2.202 that, while a final written agreement may not be contradicted by evidence of a prior agreement or a contemporaneous oral agreement, it "may be explained or supplemented (1) by course of dealing or usage of trade." In the comment the framers state: "1. This section definitely rejects: (a) Any assumption that because a writing has been worked out which is final on some matters,

---

1. All sectional references are to the Uniform Commercial Code as found in V.T.C.A., Business & Commerce Code, § 1.101 et seq.

it is to be taken as including all the matters agreed upon." The comment continues:

"2. Paragraph (a) makes admissible evidence of course of dealing, *usage of trade* . . . to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. *Such writings* are to be read on the assumption that the course of prior dealings between the parties *and the usages of trade* were taken for granted when the document was phrased. *Unless carefully negated* they have become an element of the meaning of the words used."

We repeat the definition found in § 1.-205(b):

"A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts."

In the same section, sub-paragraph (c), it is provided:

"A course of dealing between parties and any *usage of trade* in the vocation or trade in which they are engaged or of which they are or *should be aware* give particular meaning to and supplement or qualify terms of an agreement."

In the comment we note that by adopting "usage of trade," the "Act expresses its intent to reject those cases which see evidence of 'custom' as representing an effort to displace or negate 'established rules of law'."

The trial court excluded the proffered testimony from Modine's witnesses; it even excluded the testimony Modine elicited from Jud's vice-president on the same subject at a time when Jud was actively prosecuting its cause of action for damages against Modine. Furthermore, the evidence as to usage of the trade in the area of approved submittal data was not submitted to the jury in any form or manner, even though Modine had requested issues thereon as we will mention later.

Usage of the trade was not "carefully negated" in the written agreement as required in Comment 2, § 2.202; in fact, the written agreement is silent on the question. School District, in effect, urged the old and superseded objections that the parol evidence prohibited the introduction of evidence on usage of the trade; and, the trial court sustained the objections.

In somewhat similar circumstances, the Court of Appeals in Columbia Nitrogen Corporation v. Royster Company, 451 F.2d 3 (4th Cir. 1971), held:

"The contract does not expressly state that course of dealing and usage of trade cannot be used to explain or supplement the written contract. [451 F.2d at 9]

\* \* \* \* \* \*

"Since the Code assigns course of dealing and trade usage unique and important roles, they should not be conclusively rejected by reading them into stereotyped language that makes no specific reference to them." (Id. at p. 11)

Similarly, in Provident Tradesmens Bank & Trust Co. v. Pemberton, 196 Pa. Super. 180, 173 A.2d 780, 784 (1961), the court used language applicable to the case at bar, saying:

"In the instant case it cannot be said that the well established custom is carefully negated by the use of a printed form which contains words applicable to the text of the agreement itself without any reference to a custom or usage established outside of the four corners of the agreement."

The Court of Claims used these words in stating the rule in Kenneth Reed Construction Corp. v. United States, 475 F.2d 583, 588 (Ct.Cl.1973): "If it was the intention

of defendant to alter existing trade practices and require that the wooden forms be constructed to tolerances more restrictive than customary, it had the obligation to so state in clear and unambiguous language." So it is here.

The thrust of School District's argument is, in effect, that evidence of trade usage is inconsistent with the express provisions of the specifications, placing reliance upon § 1.205(d). The reliance is misplaced. Unlike Comment 2 to § 2.202, quoted earlier, which permits parties to carefully negate usage of trade in their agreement, and which results in the exclusion of usage of trade in toto, § 1.205(d) does not result in the *exclusion* of evidence of usage of trade from the agreement, but merely permits inconsistent *express* terms thereof to control.

We have found no cases from our state construing this provision but our attention has been called to Michael Schiavone & Sons, Inc. v. Securalloy Company, 312 F. Supp. 801, 804 (D.Conn.1970), wherein the court, discussing the statute said: "[T]o be inconsistent the terms must contradict or negate a term of the written agreement; and a term which has a lesser effect is deemed to be a consistent term." So tested, there is no inconsistency, as defined in the section under consideration.

Therefore, we are of the opinion that the trial court fell into error in excluding the testimony on custom and usage in the trade with reference to the "sensible heat" capacity of the Modine equipment. In determining whether the exclusion of this testimony was reasonably calculated to cause and probably did cause the rendition of an improper judgment, we are required to examine the record as a whole and to indulge every reasonable presumption consistent with the record in favor of the correctness of the judgment. Gordon v. Aetna Casualty & Surety Company, 351 S.W. 2d 602, 604 (Tex.Civ.App., Eastland, 1961, error ref.). The excluded testimony brought forward satisfies the rule enunciated in *Gordon,* supra. Cf. McDowell v.

Central Power & Light Company, 420 S. W.2d 816, 819 (Tex.Civ.App., Corpus Christi, 1967, no writ).

This is a judgment factor; and, having so examined and tested the record, we are of the opinion that reversible error is presented. Modine's points of error numbers 1 through 9 are sustained.

During the course of trial, and while one of Modine's witnesses was being interrogated, the trial court gave instructions to the jury which form the basis of Modine's point 14:

"Ladies and gentlemen of the jury, I am going to permit, as I have throughout this trial, witnesses to testify to the custom, general practice, etcetera, in that vein, of a particular industry. *I will not permit them to testify to customs and usages in a trade or industry that will vary the terms of written contracts in evidence in this case or permit—or attempt to vary them."*

Modine immediately objected to the instruction on the ground "that it is a comment on the weight of the evidence, telling the jury that custom cannot vary the terms of a written contract, and I feel that I have to make a motion for mistrial in order to preserve the record." The objection and motion were both overruled and now form the basis of Modine's point 14.

From our discussion of the subject, it is apparent that we are of the opinion that the instruction was contrary to the rules of law governing the receipt of testimony concerning usage of the trade. More importantly, however, such instruction clearly was a comment on the weight of the evidence and constituted error. Pittsburg Coca-Cola Bottling Works v. Ponder, 443 S.W.2d 546, 551 (Tex.1969). "[A] judge has no more right to tell the jury that certain evidence does not prove a particular fact than he has to tell them that certain other evidence does prove such fact." Hale v. Barnes, 155 S.W. 358, 361 (Tex. Civ.App., Austin, 1913, no writ); Gulf In-

surance Company v. Vela, 361 S.W.2d 904, 907 (Tex.Civ.App., Austin, 1962, error ref. n. r. e.). Point 14 is sustained.

### 6. Submittal Data as Condition Precedent to Performance

There is still another problem presented by the record and one which has given us some difficulty, Modine's contention that the unconditional approval by School District of Modine's "submittal data" was a condition precedent to its obligation to deliver any equipment. A subsidiary contention is that the court erred in refusing Modine's requested issues inquiring whether submittal data unconditionally approved by the School District was a condition precedent to the delivery of the equipment and whether the condition was fulfilled.

As we understand the technical details, the "submittal data" mentioned in this series of points is a written document prepared by the manufacturer's representative which sets out in great detail the technical description, specifications, and capabilities of the equipment to be furnished under the bid. This data is submitted to the owner's engineer for approval; and, only after approval, the manufacturer begins the actual manufacturing of the equipment for delivery under the contract.

Modine offered three witnesses (the engineer in charge of air conditioning the Dallas schools, another engineer employed by its sales representative in Houston, and one of its own engineers) who testified that it was the custom of the trade and generally known that a manufacturer would not begin the actual fabrication of a unit until he knew that the prototype or specifications had been unconditionally approved by the engineer for the purchaser. Modine also called Jud's vice-president as an adverse party and elicited substantially the same testimony from him:

"Q  The submittals had to be filed, and they had to be approved?

"A  Yes, sir.

"Q  Now, in whatever interval of time . . . there would be until the submittals would be approved, would you normally expect a manufacturer to do any work on the order?

"A  No, sir, I would not, not until he had approved submittals, approved submittal data.

"Q  Not until he had approved submittals?

"A  That's right."

Later in the trial Jud's vice-president reiterated this testimony, saying:

"Q  Did you know that the manufacturer couldn't start to manufacture until there had been approved submittals?

"A  I certainly did, yes, I did.

"Q  Did you know that they could not deliver without approved submittals?

"A  Yes, I did."

The LFH bid of May 5, 1969, about which the entire controversy turns, had a reference to delivery dates of the equipment if the bid was accepted. A footnote incorporated into the bid read: "Based on receipt of purchase order and approved submittal by May 30."

Modine's "terms and conditions of sale" (Form 75–706) shown to have been attached to the LFH proposal of May 5, contained these words:

"Notwithstanding any provisions to the contrary contained in Buyer's order form or in any plans and specifications referred to therein, Buyer's return to Modine of any 'Approval of Submittal Data' (as hereinafter defined) shall constitute Buyer's specification of the ordered products and agreement to accept promptly after delivery all products furnished by Modine conforming to the submittal data so approved."

Modine's letter of June 2 to School District's superintendent, which he was requested to sign and return, mentioned earlier, again referred to approved submittals, the final paragraph thereof being copied in the margin.[2]

Neither School District nor Jud offered any evidence that either had submitted an unconditional approval of submittal data to Modine at any time. Nor did any of the appellees offer any proof that unconditional approval of submittal data was not uniformly required by custom and usage in the trade.[3]

■ The trial court refused several requested issues submitted by Modine which would have inquired of the jury if it was agreed between the parties that the delivery of air conditioning equipment "was conditioned upon submittal data approved unconditionally" by School District upon three separate dates: May 30, 1969; June 6, 1969; and July 28, 1969. The next series of issues, keyed to the same dates, inquired if "submittal data was approved unconditionally" by School District upon the several dates mentioned.

Over Modine's objections, the court submitted Special Issue No. 5 which inquired, substantially, if Modine agreed to deliver the equipment in accordance with LFH's bid of May 5, "upon the condition that the Superintendent of Northeast Independent School District, Billy Reagan, sign and return to Modine . . . a copy of the letter dated June 2, 1969." None of the

appellees requested any other submission of the elements embodied in Modine's requested issues.

In its post-submission brief, School District replies to Modine's contentions in this manner:

"The approval of the submittals was only a term of the contract and did not constitute a requirement for the formation of the contract between North East and Modine.

[and]

"Modine has confused conditions precedent to the formation of the contract and a requirement needed to begin fabrication and delivery. The language regarding the approved submittals does not mean that the parties did not form a contract but only that detailed terms were to be worked out later."[4]

We are in accord with the first statement of School District's counsel noted immediately above—the approval of submittals was not a condition precedent to the *formation* of the contract; but, counsel, in his second quotation, does not quite hit the mark. The approval of the submittal data was a condition precedent to the *performance* of the contract. Justice Klingman in Toland v. Kaliff, 435 S.W.2d 260, 262 (Tex.Civ.App., San Antonio, 1968, no writ), set out with admirable clarity the law governing this point, saying:

"A condition precedent in the law of contracts is such as must happen or be

2. "With your agreement *and with the approved submittals to verify* equipment identification in our hands by June 6, we will be in a position to meet your required shipment. Your signature on a returned copy of this letter will constitute your agreement and we will look forward to proceeding without delay." (emphasis ours)

3. Cf. §§ 1.205(c) and 2.202, Comment 2, U.C.C.

4. As to the last sentence quoted, we call attention to the recent case of Parker Chiropractic Research Foundation v. Fairmont

Dallas Hotel Company, 500 S.W.2d 196 (Tex. Civ.App., Dallas, 1973, writ pending), wherein the court said: "An agreement to make a future contract must be definite and certain upon all the subjects to be embraced in such future agreement. Thus, to be enforceable, a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as a result of future negotiations. Where a preliminary contract leaves certain terms to be agreed upon for the purpose of a final contract, there can be no implication of what the parties will agree upon." (Slip op. p. 7, citations omitted)

performed before a right can accrue to enforce an obligation dependent upon the happening or performance thereof against another in favor of one claiming such right. . . . *A condition precedent in the law of contracts must be either a condition which must be performed before agreement of parties shall become a binding contract, or may be a condition which must be fulfilled before duty to perform existing contract arises.* . . . 'When a promise is subject to a condition precedent, there is no liability or obligation on the promissor and there can be no breach of the contract by him until and unless such condition or contingency is performed or occurs.' " (citations omitted)

In addition to the authorities cited in *Toland,* see: Parkview General Hospital, Inc. v. Eppes, 447 S.W.2d 487, 490 (Tex. Civ.App., Corpus Christi, 1969, error ref. n. r. e.); Perry v. Little, 377 S.W.2d 765, 768–769 (Tex.Civ.App., Tyler, 1964, error ref. n. r. e.); 5 Williston on Contracts (3d ed. 1961, Jaeger) § 666A at 142; 17 Am. Jur.2d, Contracts § 321, p. 751 (1964); 3A Corbin on Contracts § 628 at 16 (1960); Restatement, Contracts § 395 (1932).

Professor Corbin, 6 Corbin on Contracts § 1252, p. 2 (1962), expresses the rule in this manner:

"When a contractual duty is subject to a condition precedent, whether that condition is express, implied, or constructive, there is no duty of immediate performance and there can be no breach of that contractual duty by mere nonperformance, unless the condition precedent is either performed or excused. If such a condition precedent is neither performed nor excused within the time that is required, such failure now makes it impossible for a breach of contract to occur. Nonperformance of the primary contractual duty can now never operate as a breach of it; and no remedy for enforcement will ever be available. Therefore, the contractual duty must be regarded as discharged."

For the purpose of passing upon this series of points, we will concede that Modine had a binding contract with School District to furnish the equipment *and* to accept a purchase order from the installation contractor subsequently selected by School District (Special Issues Nos. 5–7). Special Issue No. 8 simply found that the submittal data furnished on June 23, 1969 "was not in accordance with the requirements for said equipment set forth in the specifications"; Special Issue No. 9 found that it was not the intention of the parties to make the agreement "subject to the terms and conditions" of Modine's Document No. 75–706 entitled "Terms and Conditions of Sale."

Waiver of the condition precedent was not submitted unconditionally but upon an affirmative answer to No. 9. Modine requested, and the trial court refused, an issue which inquired if the contract "was conditioned upon submittal data approved unconditionally by" School District; and another issue submitted the same question as to Jud. Other issues requested and refused were designed to ascertain if *delivery* of the equipment was conditioned upon receipt of unconditionally approved submittal data.

Modine's Document No. 75–706 was only a part of the evidence on the question of the requirement of approved submittal data. As has been indicated earlier, the witnesses were in substantial accord that no manufacturer would begin the building of a large number of complex pieces of equipment without assurance that the equipment would meet the approval of the purchaser's engineer. Modine's requested issues would have submitted to the jury the ultimate issue: Was the receipt of approved submittal data a condition precedent to Modine's *performance* of the contract?

Special Issue No. 5, submitting School District's theory of the case, did not submit an ultimate issue. It was purely evidentiary and, further, Modine's requested issues, timely and properly tendered, would

have given the jury the opportunity to pass upon the question presented by the facts discussed above.

Rule 277, Rules of Civil Procedure, in effect at the time of the trial, required the court to submit ultimate or controlling issues, as distinguished from evidentiary issues. See cases collated in 3 McDonald, Texas Civil Practice (1970 Rev.Vol.) § 12.-06.1, p. 280, et seq. Not only was Special Issue No. 5 an evidentiary issue, the trial court refused Modine's requested ultimate issues. Furthermore, the manner of submission of waiver (conditional), prevented the jury from considering whether Modine, by its conduct, had waived the condition precedent. Error is apparent in the record and Modine's point 13 is sustained.

Having found error requiring reversal of the judgment of the trial court, we have examined the remaining points brought forward by Modine and do not find error requiring this court to render judgment for Modine. Under these circumstances, we will order a remand of the entire case. There are, however, certain questions which should be mentioned in view of the possibility of a new trial.

### 7. Award of Attorney's Fees

From our opening statement (Part 1, supra) it is clear that substantial sums were awarded Modine's adversaries as attorney's fees; and Modine attacks such awards by appropriate points.

In New Amsterdam Casualty Co. v. Texas Industries, Inc., 414 S.W.2d 914, 915 (Tex.1967), Justice Steakley reviewed the law on the subject and, speaking for the Court, said:

"In Mundy v. Knutson Construction Co., 156 Tex. 211, 294 S.W.2d 371 (1956) we reaffirmed the rule previously recognized as settled law in Wm. Cameron & Co. Inc. v. American Surety Co., 55 S.W.2d 1032 (Tex.Com.App.1932) that attorney's fees are not recoverable either in an action in tort or a suit upon a contract unless provided by statute or by

contract between the parties. See also Van Zandt v. Fort Worth Press, 359 S.W.2d 893 (Tex.Sup.1962), and cases there cited, stating the rule that statutory provisions for the recovery of attorney's fees are in derogation of the common law, are penal in nature and must be strictly construed."

See also, Tenneco Oil Company v. Padre Drilling Company, 453 S.W.2d 814 (Tex. 1970); Turner v. Turner, 385 S.W.2d 230 (Tex.1964).

█ █ Jud makes no reply to Modine's points attacking the award of attorney's fees; but School District, in reply to Modine's points attacking the award of attorney's fees, relies upon § 2.715, Uniform Commercial Code, saying: "North East Independent School District recognizes the uniqueness of its position but feels that award of attorney's fees in this case is justified by the UCC and equity." We agree on the "uniqueness of its position" but reject the conclusion advanced.

There was no provision in the contract subjecting Modine to payment of attorney's fees in the event of default; and, § 2.715, U.C.C., does not specifically allow the recovery thereof. Indeed, there can be no recovery of punitive damages under the new code. Fredonia Broadcasting Corp., Inc. v. RCA Corporation, 481 F.2d 781, 804 (5th Cir. 1973), a diversity case making application of the laws of Texas. And, we should remember that an award of attorney's fees is penal in nature. Van Zandt v. Fort Worth Press, 359 S.W.2d 893, 895 (Tex.1962).

There being no contractual or statutory basis for the award of attorney's fees to School District or Jud, it follows that it was error for the court to include such an allowance in the judgment. Upon another trial, the pleadings should be amended so as to omit a prayer for such attorney's fees, no evidence thereon should be introduced and, of course, no issues thereon should be submitted.

When we come to consider the award of attorney's fees to LFH, we are on slightly different grounds. LFH was sued by School District and the jury found that it was acting as the agent of Modine in its dealings with Jud and School District. In passing, we note that there was some evidence to support such findings and we accept the findings without detailing the evidence in support thereof. Under these circumstances, LFH sought indemnity against Modine as well as payment of its commission and its attorney's fees. A single award of fees was made.

The rule is clear that an agent who, in the performance of his duties for his principal, incurs liability for an act not morally wrong, may have indemnity from the principal. Oats v. Dublin Nat. Bank, 127 Tex. 2, 90 S.W.2d 824, 829 (1936); Minnesota Mutual Life Insurance Company v. Weeks, 408 S.W.2d 128, 130 (Tex.Civ.App., Houston, 1966, no writ). This right of indemnity includes reasonable counsel fees incurred. Fisher Construction Company v. Riggs, 320 S.W.2d 200, 211 (Tex.Civ.App., Houston, 1959, no writ), and cases therein cited.

LFH sought its commissions upon the sale under its contract with Modine; and, we note that there was no provision therein which authorized or allowed the recovery of attorney's fees. Moreover, LFH is a corporation and its cause of action for recovery of the commissions arose before the effective date of the 1971 amendment to Art. 2226, V.A.C.S. Prior to May 17, 1971, the effective date of the amendment, a corporation was not included among those entitled to recover attorney's fees. The right to recover was conferred by Acts 1971, 62nd Leg., p. 1073, ch. 225, § 1, effective May 17, 1971. Having no right by contract or by statute to recover attorney's fees in its claim for commissions, LFH was not entitled thereto under the authorities heretofore cited in connection with the claims of Modine and Jud for fees.

Moreover, we note that while LFH was entitled to recover its attorney's fees in defense of the suit brought against it by School District, Jud and its own claim of indemnity against Modine, no effort was made to allocate the amount of such fees to the claim for commissions and those incurred in its claim for indemnity. Upon another trial, such proof should be made and the evidence confined to fees arising out of the claim for indemnity. International Security Life Insurance Co. v. Finck, 496 S.W.2d 544, 546–547 (Tex.1973).

## 8. Conclusion

While we have not commented upon all eighty-five points of error assigned by Modine, we have reviewed each carefully. Except as herein noted, we do not find reversible error has been shown and each of the points not herein mentioned is overruled. Because of the errors discussed, the judgment of the trial court is reversed and the cause is remanded for further proceedings in accordance with this opinion. Costs are adjudged against the appellees, jointly and severally.

Reversed and remanded.

## ON REHEARING

All parties have filed motions for rehearing and we have given careful consideration to each motion. Being convinced that our original determination was correct, the motions for rehearing filed by School District, Modine, and LFH are each overruled and refused.

Jud's motion for rehearing contains a single assignment: This court erred in reversing the judgment in favor of Jud against School District, there being no appeal from said judgment by School District. The point is well taken and is sustained.

Based upon adequate pleadings, sufficient evidence, unassailed jury findings, and a judgment from which School Dis-

trict did not appeal, Jud recovered judgment against School District and Modine, jointly and severally, for $61,000. School District was given judgment for indemnity against Modine; but only Modine has appealed from Jud's judgment. School District's liability to Jud was primary and independent and in no manner dependent upon Modine's liability for breach of the alleged contract. Cf. Adams v. Houston Nat. Bank, 1 S.W.2d 878, 881 (Tex.Comm. App., 1928, holding approved). Jud was and is entitled to only one recovery for the damages and it has a final judgment against School District therefor.

School District's claim for indemnity against Modine is not dependent upon Jud's presence in the new trial which we have ordered. School District's liability to Jud has been established in an adversary trial in which Modine participated. Nor are the claims of School District, Jud, and Modine so interwoven as to require a reversal of the whole judgment. This facet of the case is controlled by the rule of law announced in Lockhart v. A. W. Snyder & Co., 139 Tex. 411, 163 S.W.2d 385, 392 (1942):

> "It is the general rule that where one party appeals from a judgment, a reversal as to him will not justify a reversal against the other nonappealing parties. This rule, however, does not apply in cases where the respective rights of the appealing and nonappealing parties are so interwoven or dependent on each other as to require a reversal of the whole judgment where a part thereof is reversed."

See also, Dairyland County Mut. Ins. Co. of Tex. v. Martinez, 484 S.W.2d 785, 788 (Tex.Civ.App., El Paso, 1972, error ref. n. r.e.).

Jud's motion for rehearing is granted; the cause of action of Jud against School District which was merged into the judgment against School District is now severed from the remainder of the case and Jud's judgment against School District alone is now affirmed. Our prior judgment is amended and modified in this respect only.